IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHN O. WALSH, JR. #311 111,           )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )   CIVIL ACTION NO. 2:20-CV-653-RAH-SRW
                                        )              [WO]
WARDEN BUTLER, *et al.*,                )
                                        )
        Defendants.                     )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I.  INTRODUCTION[1]

Plaintiff John Walsh, Jr., a state inmate proceeding *pro se*, filed this 42 U.S.C. § 1983 action challenging the constitutionality of conditions at the Ventress Correctional Facility ("Ventress"). Walsh's amended complaint alleges that the conditions at Ventress are hazardous to his health and safety due to the coronavirus pandemic and to his potential risk of exposure to the virus while incarcerated.  Doc. 5 at 2–10.  Specifically, Walsh complains that correctional officials acted with deliberate indifference to his health and safety when inmates who had tested positive for COVID-19 while housed at the Easterling Correctional Facility were transferred to Ventress, which until then, Walsh maintains, was "COVID 19 free."  Doc. 5 at 4.  Walsh also complains that he has been denied access to mental health treatment for stress and to temperature checks.  Doc. 5 at 4.  In support of his allegations, Walsh maintains that Ventress is overcrowded and inmates "sleep less than four feet apart . . . and sit shoulder to shoulder with other inmates in the dining hall [which] alone makes Ventress Correctional Facility an incubator for growing bacteria and disease." Doc. 5 at 9.

---

[1]All documents and page numbers cited in this recommendation are those assigned by the Clerk in the docketing process.

Walsh's amended complaint contains a request for issuance of a preliminary injunction directing that "all the COVID 19 patients [be sent] back to the camp they came from and not bring any more to Ventress Corr. Facility."  Doc. 5 at 5.  Based on the foregoing, the court issued an order directing the defendants to file a response to the motion for preliminary injunction.

Upon consideration of Walsh's motion for preliminary injunction, and after thorough review of the defendants' responses to the motion (Docs. 26, 28), including supporting evidentiary materials, the court concludes that the motion is due to be denied.

## II.  DISCUSSION

The COVID-19 pandemic has swept through the United States and the world at an extraordinary pace with serious consequences.  As stated by the Eleventh Circuit,

> [i]t would be a colossal understatement to say that the COVID-19 pandemic has had far-reaching effects. It has changed everything from the way that friends and families interact to the way that businesses and schools operate to the way that courts hear and decide cases. The virus, though, poses particularly acute challenges for the administration of the country's jails and prisons. Because incarcerated inmates are necessarily confined in close quarters, a contagious virus represents a grave health risk to them—and graver still to those who have underlying conditions that render them medically vulnerable. And for their part, prison officials are faced with the unenviable (and often thankless) task of maintaining institutional order and security while simultaneously taking proper care of the individuals in their custody.

*Swain v. Junior*, 961 F.3d 1276, 1280 (11th Cir. 2020).

## A.  Response to COVID-19 by the Centers for Disease Control and Prevention

The United States Centers for Disease Control and Prevention ("CDC") issued its "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correction and Detention Facilities" in response to the COVID-19 pandemic.  Doc. 26-4 at 2–30.  Generally, this Guidance provides that "[i]n an effort to prevent or mitigate the introduction and spread of COVID-19 in these facilities, the CDC recommends that a number of steps be taken at [such] facilities, including but not limited to: (1) restricting or suspending the transfers of detained persons and to subject any

transfers to medical isolation to evaluate if COVID-19 testing is appropriate; (2) quarantining all new inmates for 14 days before they enter into the general population; (3) cleaning and disinfecting surfaces that are frequently touched multiple times per day, including the use of disinfectants effective against the virus; (4) providing detainees, at no cost, with soap, running water, and hand drying machines or paper towels; (5) implementing social distancing strategies to increase the physical space between each detained person; and (6) medically isolating confirmed or suspected COVID-19 cases." *Archilla v. Witte*, 2020 WL 2513648, at *3 (N.D. Ala. May 15, 2020).  The CDC's Guidance is subject to both adaptation for specific institutional settings and revision based on the knowledge gained by its officials regarding COVID-19.

## B.  Defendants' Responses to the Pending Motion for Preliminary Injunction

In their responses to the pending motion for preliminary injunction, the defendants argue that preliminary injunctive relief is not warranted in light of the measures undertaken by correctional officials and medical personnel in response to the COVID-19 pandemic.

Ruth Naglich, the Associate Commissioner for Health Services for the Alabama Department of Corrections ("ADOC") and the person responsible for oversight of both the individuals employed in the Office of Health Services ("OHS") and the ADOC's health services contractor, provided a detailed declaration dated November 24, 2020 explaining the efforts undertaken by correctional and medical officials in an effort to prevent or mitigate the introduction and spread of COVID-19 in the state's correctional facilities.  In this declaration, she offers the following information:

> As ADOC's Associate Commissioner for Health Services, I do not personally know the Plaintiff, an inmate who is currently incarcerated in one of our facilities. However, I am very familiar with ADOC's current healthcare delivery systems and the policies and procedures that guide healthcare services provided to inmates at various facilities[.] It is my understanding that the Plaintiff is concerned about exposure to the novel coronavirus disease 2019 ("COVID-19").

The individuals employed in ADOC's OHS, including me, monitor the overall delivery of healthcare to inmates within ADOC facilities by its private healthcare contractor, Wexford Health Sources, Inc. ("Wexford"); adopting and/or enacting administrative policies and procedures related to the healthcare delivery system within ADOC facilities; overseeing ADOC's compliance with legal and administrative requirements pertaining to healthcare such as activities during intake and housing of new and existing inmates; and monitoring the budgetary and financial aspects of the healthcare system within ADOC facilities.

During the pandemic associated with COVID-19, ADOC's OHS, including me, has focused on the most widely accepted and known methods to reasonably prevent the introduction and spread of COVID-19. These methods include information published by the Centers for Disease Control and Prevention, an operating division of the U.S. Department of Health and Human Services ("CDC"), specifically, the most recent version of "Guidance on Management of Coronavirus Disease 2019 (COVID-2019) in Correctional and Detention Centers" (the "CDC Guidance") on October 21, 2020, containing guiding principles for federal and state prisons, local jails, and detention centers in response to the threat posed by COVID-19. The CDC continues to update these guidelines with the latest version released on October 21, 2020. ADOC will monitor CDC guidelines for correctional and detention centers as they are modified or updated and will follow these guidelines. A true and correct copy of the CDC guidance is attached as **Exhibit 1**, and available [online from the CDC]. Even before the CDC Guidance, CDC provided general recommendations on preventing the spread of COVID-19 and management of persons testing positive for COVID-19. Nevertheless, ADOC used the general CDC guidance and the specific CDC Guidance to develop its prevention and management plan for COVID-19.

OHS's efforts have focused on (among other things) operational preparedness, prevention of the spread of COVID-19 through reinforcing hygiene practices, cleaning and disinfection of facilities, screening for symptoms among staff and inmates, communication among correctional, administrative, medical, and mental-health staff, social distancing, restriction of movement and cessation of new intakes, visitors, and non-essential persons into the facilities, securing hygiene, cleaning, and medical supplies (including personal protective equipment ["PPE"]), infection control, and strategies to manage confirmed or suspected COVID-19 cases.

In early March 2020, ADOC began planning for COVID-19. ADOC and Wexford formed Pandemic Planning Teams, at a facility level, comprised of a Warden, Health Service Administrator, OHS Regional Associate Director of Health Services, facility Medical Director, and other persons based on the scope of a facility's operations such as the Facility Food Service Manager and Facility Maintenance. For COVID-19 planning at a facility level, OHS provided a checklist to ensure the facility Pandemic Planning Team completed tasks in preparation for COVID-19, including, for example, assessing correctional and healthcare staff, evaluating locations to quarantine an inmate or cohorts of inmates, monitoring par levels of supplies of PPE, soap, paper towels, and disinfectants, evaluate food supply, and educating staff and inmates regarding signs and symptoms of COVID-19.  Additionally, ADOC's OHS developed a system-wide clinical management

plan applicable to all ADOC facilities for use across the system. This plan included prevention and management strategies based upon the response stage from phase 1 to phase 5.

On a routine basis, ADOC proactively prepares for the prevention of various infectious diseases during the intake process, but a global pandemic of this magnitude is entirely different and unprecedented in recent history. The circumstances are certainly unprecedented in terms of my tenure with ADOC. For this reason, ADOC took decisive action when it became clear COVID-19 would spread to the United States. ADOC educated persons living and working within ADOC facilities about COVID-19. For example, ADOC posted information about COVID-19, including documents from OHS and CDC, identifying signs and symptoms of COVID-19, providing directions for a person with signs and symptoms of COVID-19, describing proper hygiene and other preventative practices, and identifying ways to address stress associated with COVID-19 throughout ADOC facilities (including the one to which the Plaintiff is assigned). ADOC also distributed this same information directly to staff and inmates. A true and correct copy of the OHS and CDC informational documents regarding COVID-19 are attached as **Exhibit 2**.

Similarly, consistent with the CDC Guidance ADOC stopped accepting new intakes and completely shut down its facilities to all outside visitors to avoid these activities as a source of COVID-19 introduction and spread within the ADOC system during the pandemic. ADOC Commissioner Jefferson Dunn issued a moratorium on March 20, 2020, ceasing the new intake of state inmates into the ADOC system for at least a thirty (30) day period, except for state inmates with urgent or emergent healthcare conditions approved by ADOC's OHS, including me, on a case-by-case basis.

For staff working in ADOC facilities, ADOC implemented the screening of staff as they arrived for work or when they called in sick. A pre-work screening consists of a temperature check and questionnaire. For staff who call in sick, ADOC created and maintains a tracking log and questionnaire to evaluate if and when a staff member may return to an ADOC facility for work. A true and correct copy of the screening tools and log are attached as **Exhibit 3**.

ADOC provided the CDC guidelines for cleaning to facilities, including a cleaning check-list for the kitchen. A true and correct copy of a facility kitchen checklist is attached as **Exhibit 4**. Since distributing these cleaning instructions, ADOC has reviewed compliance with these instructions at its facilities.

ADOC distributed facemasks to persons living and working in ADOC facilities and provided written instructions on the proper way to wear, store, remove, and clean the facemasks. ADOC required inmates to acknowledge, in writing, the acceptance or rejection of the facemasks and written instructions. A true and correct copy of the written instructions and acknowledgement form are attached as **Exhibit 5**.

During the 30-day moratorium on new intakes, ADOC developed a pilot program for the controlled restart of the intake process. ADOC began implementation of its pilot program on April 21, 2020, for inmates with security levels 1-4 (i.e., no maximum-security inmates). To protect the existing inmate population, ADOC reinstituted the intake process for male inmates at Draper

Correctional Facility ("Draper") and for female inmates at a satellite facility established in proximity to the Julia Tutwiler Prison for Women ("Tutwiler").

Consistent with CDC Guidance, during the pilot program, ADOC tests and quarantines new intakes at Draper and Tutwiler for a minimum of fourteen (14) days before transferring them to an assigned ADOC facility upon completion of the intake process, and a negative COVID test or completion of a physician-directed quarantine period. Because of the limited space at Draper and Tutwiler, ADOC can receive no more than one hundred twenty (120) new intakes every fourteen (14) days. To qualify for intake into the ADOC system under the pilot program, the sending county facility is asked to represent (among other things) that the new intake is not symptomatic of COVID-19, no inmate in the sending facility tested positive for COVID-19 in the fourteen (14) days preceding the transfer date and the sending facility and inmate are not currently under quarantine due to a COVID-19 outbreak. At the conclusion of the pilot program, ADOC will evaluate continuing, changing, or terminating the pilot program, depending on the conclusions reached from the pilot program, surrounding community outbreaks, and the continued availability of PPE. Even if the pilot program continues, because of the uncertainty associated with the current and any future COVID-19 or other pandemic and the lack of an existing treatment for COVID-19, ADOC may have to reinstitute the moratorium on intakes from county jails in the future.

ADOC implemented a pre-screening process concerning the transferring of inmates between ADOC facilities. The pre-screening requires medical staff to evaluate the inmate in five (5) areas to determine if transfer is appropriate. The pre-screening directs medical staff to interview the inmate for COVID-19 symptoms, review the inmate's Sick Call visits for the last fourteen (14) days, determine if the inmate or his housing unit has been on watch or quarantine for COVID-19 in the last fourteen (14) days, verify if the inmate has been tested for COVID-19 and awaiting results, and determine if the inmate has tested positive within the last 90 days. The form restricts transfers of inmates with positive exposures to COVID-19, but provides for transfer if the request concerns transfer for urgent or emergent health care needs, or the need for a higher level of care with approval of a Provider or by request of OHS Administration. A true and correct copy of the Inmate Intra-System COVID-19 Pre-Transfer Screening form is attached as **Exhibit 6**.

ADOC inmates have received, and continue to receive, appropriate medical care as it relates to the prevention and management of COVID-19. ADOC's and its healthcare contractor's staff have worked, and continue to work, tirelessly to prevent the introduction and spread of COVID-19 throughout the ADOC system.

As Associate Commissioner for Health Services, I participated in and oversaw, and continue to participate in and oversee, the preparation, prevention, and management efforts associated with COVID-19 within the ADOC system. At all ADOC's facilities, ADOC and its healthcare contractor have taken the following prevention and management measures:

a. educating inmates and staff through oral and written communications, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;

b.  encouraging inmates and staff to engage in proper hygiene practices and social distancing;

c.  providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing [but because of its potential for misuse in creating drinking alcohol, hand sanitizer is not placed in housing units or recreational areas];

d.  continuing medical appointments such as chronic care clinics, sick-call appointments, and community speciality (sic) healthcare services;

e.  suspending copays for inmates seeking medical services;

f.  implementing intensified cleaning and disinfecting procedures;

g.  suspending the intake of new inmates and, when restarted, ensuring an appropriate quarantine and screening before transferring the new intakes from a temporary intake facility to a permanent intake facility, as noted above;

h.  performing verbal screening and temperature checks for all persons entering the facility as recommended by CDC facility;

i.  implementing social distancing strategies;

j.  providing a minimum of four (4) masks to each inmate, along with instructions on wearing, cleaning, and caring for the masks;

k.  providing masks, gowns, gloves, and face shields to administrative and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;

l.  providing a supplemental supply of personal protective equipment, including masks and gloves, gowns, and face shield to medical and mental-health staff;

m.  implementing a quarantine or medical isolation plan, consistent with CDC Guidance, for any inmate who tests positive for COVID-19 or is suspected of having or being exposed to COVID-19; and

n.  monitoring inmates for symptoms of COVID-19.

Additionally, ADOC has implemented the CDC's guidance and recommendations for quarantine by establishing three distinct protocols for quarantine. Level one quarantine is referred to as "watchful wait." Inmates are placed in level 1 quarantine when they have been identified as a 'cohort' of an inmate who has been identified as having signs and symptoms of COVID-19 and is awaiting testing, or has tested positive for the virus. Level one is implemented when direct or prolong exposure is suspected, but has yet to be confirmed. Level one is generally applied when inmates are housed in a large open dorm and the inmates are

treated as a 'group' referred to by CDC as 'cohorts'. The time period for level one is generally fourteen (14) days from the date of suspected exposure. When inmates are placed in level one quarantine, at a minimum, the following precautions are taken:

- Healthcare provider recommendation and/or approval is sought;

- Inmate education and security education if administered;

- Temperature is taken once per day for asymptomatic individuals;

- Meals are taken as a group and are staggered or served at the end of each meal cycle separate from other dorms or housing units;

- We ensure that all inmates in the unit and the patient have access to clean mask;

- Individual Soap and Hand Sanitizer (sanitizer when available) is provided;

- Inmates are escorted to Medical or Mental Health Units separately;

- Head-Toe alternating sleeping to spaced bunks is required;

- Dorm-Shower-Toileting areas are cleaned a minimum of per each shift;

- Yard Time or outside recreation for those in level 1 quarantine are kept separate from other dorms with 6 ft. social distancing;

- Cleaning supplies are made available in dorms/single cells; and

- Warden and Shift Office receive notification.

Level two quarantine is utilized when an inmate is exhibiting signs and symptoms of COVID or has been confirmed as having prolonged direct exposure to another inmate who has tested positive for COVID-19. The inmate is tested for the virus and remains on level two quarantine until the results of the diagnostic test are received. When an inmate is placed in level two quarantine, at a minimum the following precautions are taken:

- Healthcare provider recommendation and/or approval is sought;

- Inmate education and security education is provided;

- Temperature is taken a minimum of twice (2x) per day, or more frequently as ordered by a Provider;

- All monitoring, meals, and activities will be conducted in their quarantine space. Disposable paper products for meals are utilized;

- It is ensured that inmates/patients have clean masks, this is checked daily;

- Mask must be worn when in quarantine space;

- Individual soap and hand sanitizer (sanitizer when available) are provided;

- Medical and mental health services are provided at the quarantine area, or the inmate is brought to a designated area within the health care unit for appointments in the appropriate Personal Protective Equipment (PPE);

- Security and health care staff wear the CDC designated PPE's when interacting with the inmate;

- Cleaning supplies are made available in housing area or individual cell;

- Individual shower and toileting areas are recommended and are cleaned after each use;

- Trash should be tied in a trash bag and handled with gloves until removed from the facility and managed as medical bio-hazardous waste;

- Yard Time for those in level two quarantine are kept separate from other dorms with 6 ft. social distancing; and

- Warden and Shift Office receive notification.

A Provider's order must be received to release an inmate from level two quarantine. Level three quarantine is medical isolation, consistent with CDC Guidance. It is required for inmates who test positive for COVID-19, whether symptomatic or asymptomatic. When an inmate is placed in level three quarantine, the follow[ing] minimum precautions are taken:

- Healthcare provider recommendation and/or approval is sought;

- Inmate education and security education is provided;

- Temperature is taken twice (2x) per day or more as indicated by the Provider's orders;

- All monitoring, meals, and activities will be conducted in their quarantine space. Disposable paper products for meals are utilized;

- When someone (wearing the appropriate PPE) enters the quarantine space the patient must wear a mask;

- Inmates/patient have clean mask check daily;

- Mask worn when out of quarantine space, face shields are to be used in addition to mask when available;

- Individual soap and hand sanitizer (sanitizer when available) are provided;

- Trash should be tied in a trash bag and handled with gloves and managed as medical bio-

9

hazardous waste;

- Any items removed from the quarantine space must be handled with gloves until it has been cleaned and sanitized;

- Healthcare at quarantine area when possible. Escort to health care unit or mental health units for appointments separately while wearing a mask and additional PPE's as needed;

- Head-Toe alternating sleeping to spaced bunks when more than one inmate/patient in level three quarantine;

- When possible level three persons should have individually dedicated toilet and lavatory. If not possible the fixtures should be cleaned and sanitized before and after each use;

- Dorm-Shower-Toileting areas cleaned a minimum of once per shift;

- Cleaning supplies made available in dorm or single cells:

- Must wear a mask during yard or outside exercise time. Time limited to COVID-19 positive inmates only wearing a mask while maintaining 6 ft. of separation-social distancing; and

- Warden and Shift Office notification – copy provided to Warden.

    All inmates and security staff have received education related to the signs and symptom[s] of COVID-l9. This education includes instructions on how to report to health care staff and request to be evaluated. All security and custody staff have received instructions to notify medical personnel immediately when an inmate is exhibiting any signs of medical or mental illness, and what precautions should be taken to transport an inmate to be seen by medical personnel. Each major ADOC correctional facility including numerous work-releases have medical staff scheduled in their respective health care units twenty-four (24) hours a day seven (7) days per week. In addition, ADOC has suspended all co-pay fees indefinitely since March, 2020 for all medical services to ensure inmates do not delay reporting their need for healthcare services. Inmates have the ability to be seen, evaluated and treated daily including holidays and weekends. ADOC's Office of Health Services (OHS) monitors, tracks and reports all suspect and confirmed cases of COVID-19 daily. This monitoring includes the number of inmates at each facility that have been quarantined, what level of quarantine was implemented and was the level of quarantine applied in compliance with CDC guidelines. OHS requires daily reporting of the number of pending, negative and positive test of all inmates including those who are in community.
    The minimum baseline for the monitoring of an inmate or inmates who are either suspect for COVID-19, or positive for COVID-19 is outlined in the CDC guidelines for the management of COVID-19 in Detention and Correctional

Facilities. However, because the signs and symptoms of COVID have been proven to vary in individuals as well as the individual level of acuity associated with the illness, monitoring and treatment is and should be inmate/patient specific. The inmate's evaluation, monitoring and treatment is prescribed by the Licensed Physician or Provider who is the inmate/patient's designated primary physician.

Inmates and staff have been educated about the need for social distancing. Different prison arrangements allow for greater adherence to social distancing requirements than others based upon the inmate population and the physical layout of the Facility.

The enforcement of wearing masks among the inmate population at each correctional facility and work-camp is managed at the facility level by the Warden. I nor any other staff member within the Office of Health Services have involvement in the disciplinary process of any inmate. As previously noted, face masks are required to be worn by staff. In terms of hygiene, staff and inmates are encouraged to maintain personal hygiene, especially hand-washing.

ADOC and Wexford, including me, continue to evaluate the COVID-19 prevention and management measures. We will modify our management measures should it become necessary in accordance with any modifications or new recommendations published by the CDC and/or the Alabama Department of Public Health recommendations.

ADOC and Wexford will continue to work closely with the Alabama Department of Public Health to evaluate the use of COVID-19 vaccinations for inmates and staff.

Doc. 28-1 at 1–16 (paragraph numbering and footnote omitted).

Reosha Butler, a warden at Ventress, filed a properly sworn declaration dated December

4, 2020, in which she states:

I reviewed Mr. Walsh's Amended Complaint (doc. no. 5) stating that he as well as other inmates have been treated with deliberate indifference due to the fact that ADOC transferred inmates with COVID-19 to the Ventress Correctional Facility and that the correctional and medical staff have not undertaken or adequately enforced measures to stop the spread of COVID-19 at Ventress Correctional Facility. I deny the allegations in Plaintiff's Amended Complaint.

I have received and reviewed a copy of Associate Commissioner Ruth Naglich's Declaration dated November 24, 2020, submitted in response to Mr. Walsh's allegations. Associate Commissioner Naglich provides a thorough description of ADOC's efforts to combat the spread of the COVID-19, and her description is consistent with the efforts being made at Ventress.

Ventress received a total of six (6) inmates from Easterling Correctional Facility during the month of July that had tested positive for COVID-19. These inmates were housed in a designated location under medical quarantine approved by ADOC's medical provider, Wexford Health Sources, Inc. ("Wexford Health").

ADOC utilized a specific housing area at Ventress that facilitated medical isolation. COVID-19 positive inmates' movements were restricted to prevent them from coming into contact with general population inmates. All activities, including meals and medical care, were provided in the medically isolated housing area. ADOC did not place a known COVID-19 positive inmate in Plaintif's dorm, or expose the general population at Ventress to COVID-19.

Ventress Administrators and Wexford Health Administrators have fought, and continue to fight the spread of COVID-19 at Ventress. Some of these actions include:

> educating inmates and staff through oral and written communications, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;

> encouraging inmates and staff to engage in proper hygiene practices and social distancing;

> providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing;

> continuing medical appointments such as chronic care clinics and sick-call appointments;

> suspending copays for inmates seeking medical services;

> implementing intensified cleaning and disinfecting procedures;

> suspending the intake of new inmates and, when restarted, ensuring an appropriate quarantine and screening before transferring the new intakes from a temporary intake facility to a permanent intake facility;

> performing verbal screening and temperature checks for all persons entering the facility and, if a person has a temperature over 100.4 degrees Fahrenheit or other symptoms of COVID-19, denying the person entry into the facility;

> implementing social distancing strategies;

> providing masks to each inmate (and a replacement if these initial masks are misplaced or destroyed), along with instructions on wearing, cleaning, and caring for the masks;

> providing masks and gloves to administrative and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;

> implementing a quarantine or medical isolation plan for any inmate or staff who tests positive for COVID-19 or is suspected of having or being exposed to COVID-19;

> monitoring inmates for symptoms of COVID-19 such as cough and shortness of breath or at least two (2) of fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell; and

> testing inmates for COVID-19 with symptoms of COVID-19 or contact with a person testing positive for or suspected of having COVID-19.

Additionally, Ventress Administrators and Wexford Health Administrators placed a notice in the inmate newsletter and posted flyers that notified inmates of emergency care and what they should do should they develop any COVID-19 symptoms. Inmates have the ability to have their temperatures taken at any time upon request, and officers have been informed to be watchful for any signs of COVID-19 symptoms.

To elaborate on the cleaning mentioned above, all surfaces, including bathroom and living areas, are cleaned and sanitized with approved disinfectants at a minimum of twice per shift, for a total of no less than six (6) times per day.

We have implemented social distancing policies recommended by the CDC to mitigate the spread of the virus. These measures include requiring all inmates to wear masks and to keep at least six (6) feet distance from one another while standing in line for meals, phones or any other matter.

Correctional staff are also required to wear face masks and practice social distancing. As of December 20, 2020, twenty-four (24) correctional staff from Ventress Correctional Facility tested positive for COVID-19. Currently, one (1) staff member is COVID-19 positive.

Additionally, Mr. Walsh also alleged that mental health services had been suspended, this allegation is false. Mental health services have been on-going. Inmates that request in writing or are referred, have been seen by mental health staff.

Doc. 28-3 at 1-5 (paragraph numbering and footnote omitted).

Celeste Hunter, a Registered Nurse who serves as the Program Administrator for the Southern District for Wexford Health Sources, Inc., the ADOC's contract medical and mental

health care provider, also filed a declaration in response to the order of the court.  In her declaration,

Ms. Hunter states:

> I am aware that Mr. Walsh alleges that he has been treated with deliberate indifference to his medical needs and alleges that he has not received adequate medical treatment at the Ventress Correctional Facility. I am also aware that Mr. Walsh alleges that he could potentially be exposed to the COVID-19 virus due to the fact that Alabama State inmates that have tested positive with COVID-19 have been transferred from the Easterling Correctional facility to the Ventress Correctional Facility.

> I am further aware that Mr. Walsh alleges that the correctional and medical staff at the Ventress Correctional Facility have not undertaken or adequately enforced measures to stem the spread of COVID-19 and therefore exposed Mr. Walsh unnecessarily to COVID-19.

> Mr. Walsh has not tested positive for COVID-19 and has not been diagnosed with COVID-19.
> Mr. Walsh was seen in the Health Care Unit (HCU) on February 19, 2020, requesting that his prescriptions be renewed.

> On March 9, 2020, Mr. Walsh was seen in the HCU for dental treatment.

> On March 25, 2020, Mr. Walsh was seen in the HCU requesting new eye glasses and a visual acuity screening was completed.

> On May 9, 2020, Mr. Walsh was seen in the HCU for follow-up dental treatment.

> On June 23, 2020, Mr. Walsh was seen in the HCU for dental treatment.

> On October 7, 2020, Mr. Walsh had his 20/21 influenza vaccine.

> On October 21, 2020, Mr. Walsh was seen in the HCU by the medical provider for a shave profile.

> On November 23, 2020, Mr. Walsh was seen by the eye doctor.

> Mr. Walsh does not suffer from any serious underlying medical conditions that would be effected by COVID-19.

> Mr. Walsh's necessary medical needs have at no time been delayed or denied.

> As the Program Administrator for the Southern District of Alabama for Wexford, I am not at the Ventress Correctional Facility on a daily basis. However, I am aware that certain inmates that have been diagnosed and tested positive with COVID-19

have been transferred from the Easterling Correctional Facility to the Ventress Correctional Facility.

I am further aware that all inmates that have tested positive with COVID-19 are kept completely separated and apart from the general population and/or other inmates at the Ventress Correctional Facility.

Inmates that have transferred from the Easterling Correctional Facility to the Ventress Correctional Facility are kept isolated and apart from inmates that have not tested positive for COVID-19.

Inmates have the ability to have their temperatures taken at the Ventress Correctional Facility and if they have any initial symptoms of COVID-19, they have been made aware that they need to report to the health care unit to be evaluated.

Mr. Walsh, like all inmates at the Ventress Correctional Facility, has been counseled about what to do should he develop any COVID-19 symptoms.

All Wexford employees including but not limited to the medical providers and nurses at Ventress, take their obligations very seriously. Problems associated with COVID-19 are closely monitored as the virus presents potential problems for the inmates, ADOC employees and Wexford employees.

Wexford employees, from a medical perspective, do all they can to protect all who are incarcerated and work at the Ventress Correctional Facility and all the correctional facilities in the state of Alabama.

Inmates are tested for COVID-19 for three separate reasons:

a. Symptoms such as fever, headache, congestion, shortness of breath, cough, loss of taste or smell, or GI symptoms. The medical provider makes the decision to test these patients.
b. Patients who are scheduled to go for an off-site appointment or procedure are tested at the request of the off-site provider.

c. Patients are tested when the decision is made from the OHS to conduct mass testing.

Every inmate that tests positive for COVID-19 is placed in isolation and seen regularly by the medical providers.

If the patient's symptoms cannot be managed on-site, they are sent to the free world ER for evaluation and treatment.

The assessment and recommendations of the CDC for adults with COVID-19 are as follows:

ASSESSMENT:

Available data indicate that persons with mild to moderate COVID-19 remain infectious no longer than 10 days after symptom onset. Persons with more severe to critical illness or severe immunocompromise likely remain infectious no longer than 20 days after symptom onset. Recovered persons can continue to shed detectible SARS-CoV-2 RMA in upper respiratory specimens for up to three months after illness onset, albeit at concentrations considerably lower than during illness, and ranges where replication-competent virus has not been reliably recovered and infectiousness is unlikely. The etiology of this persistently detectable SARS-CoV-2 RMA has yet to be determined. Studies have not found evidence that clinically recovered persons with persistence of viral RMA have transmitted SARS-CoV-2 to others. These findings strengthen the justification for relying on a symptom based, rather than test-based strategy for ending isolation of these patients, so that persons who are by current evidence no longer infectious are not kept unnecessarily isolated and excluded from work or other responsibilities.

Reinfection with SARS-CoV-2 has not yet been definitively confirmed in any recovered persons to date. If, and if so, when, persons can be reinfected with SARS-CoV-2 remains unknown and is a subject of investigation. Persons infected with related endemic human beta coronavirus appear to become susceptible again at around 90 days after onset of infection. Thus, for persons recovered from SARS-CoV-2 infection, a positive PCR during the 90 days after illness onset more likely represents persistent shedding of viral RNA than reinfection.

- If such a person remains asymptomatic during this 90-day period, then any re-testing is unlikely to yield useful information, even if the person had close contact with an infected person.

- If such a person becomes symptomatic during this 90-day period and an evaluation fails to identify a diagnosis other than SARS-CoV-2 infection (e.g., influenza), then the person may warrant evaluation for SARS-CoV-2 reinfection in consultation with an infectious disease or infection control expert. Isolation may be warranted during this evaluation, particularly if symptoms develop after close contact with an infected person.

- Correlates of immunity to SARS-CoV-2 infection have not been established. Specifically, the utility of Serologic testing to establish the absence or presence of infection or reinfection remains undefined.

16

- The recommendations below are based on the best information available in mid-July 2020, and reflect the realities of an evolving pandemic. Even for pathogens for which many years of data are available, it may not be possible to establish recommendations that ensure 100 percent of persons who are shedding replication-competent virus remain isolated. CDC will continue to closely monitor the evolving science for information that warrant reconsideration of these recommendations.

RECOMMENDATIONS:

1. Duration of isolation and precautions.

   - For most persons with COVID-19 illness, isolation and precautions can generally be discontinued 10 days after symptom onset and resolution of fever for at least 24 hours, without the use of fever-reducing medications, and with improvement of other symptoms.

   - A limited number of persons with severe illness may produce replication-competent virus beyond 10 days that may warrant extending duration of isolation and precautions for up to 20 days after symptom onset; consider consultation with infection control experts.

   - For persons who never develop symptoms, isolation and other precautions can be discontinued 10 days after the date of their first positive RT-PCR test for SARS-CoV-2 RNA.

2. Role of PCR testing to discontinue isolation or precautions

   - For persons who are severely immunocompromised, a test-based strategy could be considered in consultation with infectious diseases experts.

   - For all others, a test-based strategy is no longer recommended except to discontinue isolation or precautions earlier than would occur under the strategy outlined in part 1, above.

3. Role of PCR testing after discontinuation of isolation or precaution.

   - For persons previously diagnosed with symptomatic

17

COVID-19 who remain asymptomatic after recovery, retesting is not recommended within three months after the date of symptom onset for the initial COVID-19 infection. In addition, quarantine is not recommended in the event of close contact with an infected person.

- For persons who develop new symptoms consistent with COVID-19 during the 3 months after the date of initial symptom onset, if an alternative etiology cannot be identified by a provider, then the person may warrant retesting; consultation with an infectious disease or infection control expert is recommended. Isolation may be considered during this evaluation based on consultation with an infection control expert, especially in the event symptoms develop within 14 days after close contact with an infected person.

- For persons who never develop symptoms, the date of first positive RT-PCR test for SARS-CoV-2 RNA should be used in place of the date of symptom onset.

4. Role of Serologic testing.

- Serologic testing should not be used to establish the presence or absence of SARS-CoV-2 RNA infection or reinfection.

Wexford fully follows the guidelines and recommendations of the CDC with regard to the assessments and recommendations for the testing and treatment for adults with COVID-19.

Wexford's nursing protocols are attached hereto as Exhibit B.

The CDC COVID-19 protocols are attached hereto as Exhibit C.

Doc. 26-1 at 2–9;[2] Doc. 28-5.

Finally, the correctional defendants' response includes the December 8, 2020, sworn declaration of Dr. John Peasant, the Medical Director at Ventress, in which he provides the following information:

---

[2] Walsh's medical assessments, as set forth by Ms. Hunter in her declarations, are corroborated by the objective medical records contemporaneously compiled at the time relevant to his claims. Doc. 26-2.

Mr. Walsh has not been diagnosed with Covid-19. Mr. Walsh has at no time shown any signs or symptoms of COVID-19.

Mr. Walsh does not have any serious underlying medical conditions that would be effected by COVOD-19.

All inmates incarcerated at the Ventress Correctional Facility, including Mr. Walsh, have been educated as to the signs and symptoms of Covid-19, precautions to take, and what steps to take if they show signs or symptoms of Covid-19.

Inmates incarcerated at the Ventress Correctional Facility are not routinely tested if they show no signs or symptoms of Covid-19.

Only inmates that have positive signs or symptoms of Covid-19 are tested for the virus. The test has to be ordered by the medical provider.

Inmates are tested for COVID-19 for three separate reasons:

a. Symptoms such as fever, headache, congestion, shortness of breath, cough, loss of taste or smell, or GI symptoms. The medical provider makes the decision to test these patients.

b. Patients who are scheduled to go for an off-site appointment or procedure are tested at the request of the off-site provider.

c. Patients are tested when the decision is made from the OHS to conduct mass testing.

Patients who test positive for COVID-19 are placed in medical isolation. Single cells are used until they are filled to capacity. Once that happens arrangements are made for the positive patients to be held in an area separate from other inmates.

A medical isolation unit was established at Ventress to assist with providing care to patients who test positive for COVID-19. This area was separated from the general inmate population, and efforts were made to ensure that medical staff attending to patients in the medical isolation area did not contaminate or spread the virus to the general inmate population.

Patients who test positive for COVID-19 are screened daily for worsening of symptoms and treated accordingly. This is accomplished by nursing and medical provider assessment. Treatment is based on symptoms and can include medications such as OTC medications (Tylenol, Guiafenesin), or antibiotics, inhalers, as indicated.

If the patient's symptoms cannot be managed on-site, they are sent to the free world ER for evaluation and treatment.

There are currently no inmates at Ventress that are positive with Covid-19.

Since January 1, 2020, 17 inmates incarcerated at the Ventress Correctional Facility have tested positive for Covid-19.

Doc. 28-4 at 2–4.

## C.  Preliminary Injunction – Requisite Elements

"The grant or denial of a preliminary injunction rests within the sound discretion of the district court." *Transcon. Gas Pipe Line Co. v. 6.04 Acres, More or Less*, 910 F.3d 1130, 1163 (11th Cir. 2018); *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002) (same).  This court may grant a preliminary injunction only if the plaintiff demonstrates each of the following elements: (1) a substantial likelihood of success on the merits; (2) an  irreparable injury will occur absent issuance of the injunction; (3) the injunction would not substantially harm the non-moving parties; and (4) if issued, the injunction would not be adverse to the public interest.  *Long v. Sec'y Dept. of Corrections*, 924 F.3d 1171, 1176 (11th Cir. 2019); *Palmer*, 287 F.3d at 1329; *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998); *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983); *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352 (11th Cir. 1983).  "In this Circuit, [a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the four requisites."  *McDonald's*, 147 F.3d at 1306 (internal quotations omitted); *Wreal LLC v. Amazon.com, Inc.*, 840  F.3d 1244, 1247 (11th Cir. 2016) (internal quotations and citation omitted) ("A preliminary injunction is an extraordinary and drastic remedy, and [Plaintiff] bears the burden of persuasion to clearly establish all four of these prerequisites."); *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (holding that a preliminary injunction is issued only when "drastic relief" is necessary); *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975)

(holding that the grant of a preliminary injunction "is the exception rather than the rule," and the movant must clearly carry the burden of persuasion on each of the requisite elements).

## D.  Deliberate Indifference – Standard of Review

Only actions that deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment proscribes actions which result in subjecting an inmate to conditions that involve the wanton and unnecessary infliction of pain. *Id*. at 346.  Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted).  Prison conditions which may be "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*. at 347.  Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency."  *Id*. at 345–46; *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004).  Although the Constitution "does not mandate comfortable prisons . . . neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349).  Thus, it is well-settled that the conditions under which a prisoner is confined are subject to constitutional scrutiny.  *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eighth Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *Helling*, 509 U.S. at 31–32.  A prison official may therefore be held liable under the Eighth Amendment for acting with "'deliberate indifference'" to an inmate's health or safety when

21

the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828. To demonstrate an Eighth Amendment violation, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834; *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (holding that the law requires establishment of both objective and subjective elements to demonstrate an Eighth Amendment violation). With respect to the requisite objective element, an inmate must first show "an objectively substantial risk of serious harm . . . exists. Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028–29 (11th Cir. 2001), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). As to the subjective element, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837–38; *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838).

In sum,

[u]nder the objective component, the plaintiff must demonstrate "a substantial risk of serious harm." [*Farmer*, 511 at 834]. . . . Under the subjective component, the plaintiff must prove "the defendants' deliberate indifference" to that risk of harm by making three sub-showings:  "(1) subjective knowledge of a risk of serious harm;  (2) disregard of that risk;  (3) by conduct that is more than mere negligence." *Lane* [*v. Philbin*, 835 F.3d 1302, 1308 (11th Cir. 2016)], (quotation omitted). . . . The [relevant] inquiry . . . [is] whether the defendants "disregard[ed]" the risk "by conduct that is more than mere negligence," *id*. (quotation omitted)— or more simply stated, whether they "recklessly disregard[ed] that risk," *Farmer,* 511 U.S. at 836, 114 S.Ct. 1970.

*Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020); *King v. Fairman*, 997 F.2d 259, 261 (7th Cir. 1993) (internal quotations and citations omitted) ("To sustain his constitutional claim, the

inmate must demonstrate something approaching a total unconcern for his welfare in the face of

serious risks, or a conscious, culpable refusal to prevent harm.").

> The Eleventh Circuit,
>
> > (echoing the Supreme Court) ha[s] been at pains to emphasize that "the deliberate indifference standard ... is far more onerous than normal tort-based standards of conduct sounding in negligence," *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013), and is in fact akin to "subjective recklessness as used in the criminal law," *Farmer*, 511 U.S. at 839–40, 114 S.Ct. 1970; *see also id.* at 835, 114 S.Ct. 1970 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."). Were we to accept the district court's determination that resulting harm, the failure to take impossible measures, or even the combination of both suffices to show a criminally (and thus constitutionally) reckless mental state, "the deliberate indifference standard would be silently metamorphosed into a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not." *Goodman*, 718 F.3d at 1334.

*Swain*, 961 F.3d at 1288.

The conduct at issue "must involve more than ordinary lack of due care for the prisoner's

interests or safety. . . .  It is obduracy and wantonness, not inadvertence or error in good faith, that

characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that

conduct occurs in connection with establishing conditions of confinement, supplying medical

needs, or restoring official control over a tumultuous cellblock."  *Whitley v. Albers*, 475 U.S. 312,

319 (1986).  "The requisite mental state for prison officials is intent, or its functional equivalent,

described as deliberate indifference[.]"  *King*, 997 F.2d at 261 (internal quotations and citations

omitted).  "Only '[a] prison official's deliberate indifference to a known, substantial risk of serious

harm to an inmate violates the Eighth Amendment.'"  *Harrison v. Culliver*, 746 F.3d 1288, 1298

(11th Cir. 2014) (quoting *Marsh*, 268 F.3d at 1028); *Lane*, 835 F.3d at 1307 (11th Cir. 2016)

(holding that the Eighth Amendment is violated only when a correctional official "is deliberately

indifferent to a substantial risk of serious harm to an inmate who suffers injury.").  The Eleventh

Circuit has consistently held that "'[i]n order to state a § 1983 cause of action against prison

officials based on a constitutional deprivation resulting from cruel and unusual punishment, there

must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus

raising the [mere] tort to a constitutional stature.'" *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th

Cir. 1982) (quoting *Wright v. El Paso County Jail*, 642 F.2d 134, 136 (5th Cir. 1981), *cert. denied*,

464 U.S. 932 (1983); *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) (same).

> As applied in the prison context, the deliberate-indifference standard sets an appropriately high bar. A plaintiff must prove that the defendant acted with "a sufficiently culpable state of mind." [*Farmer*, 511 U.S.] at 834, 114 S.Ct. 1970 (quotation omitted). Ordinary malpractice or simple negligence won't do; instead, the plaintiff must show "subjective recklessness as used in the criminal law." *Id.* at 839–40, 114 S.Ct. 1970. Indeed, even where "prison officials ... actually knew of a substantial risk to inmate health or safety," they may nonetheless "be found free from liability if they responded reasonably to the risk"—and, importantly for present purposes, "even if the harm ultimately was not averted." *Id.* at 844, 114 S.Ct. 1970. This is so because "[a] prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id.* at 844–45, 114 S.Ct. 1970 (quotations and internal citations omitted); *see also Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) ("It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates...." (quotation omitted)).

*Swain*, 961 F.3d at 1285–86.

## E. The Request for Preliminary Injunctive Relief

Walsh seeks the issuance of a preliminary injunction which requires the defendants to

return all inmates who tested positive for COVID-19 to the facility in which they were housed at

the time they tested positive and not to allow any such recurrence. Doc. 5 at 5. Upon review of

the record before the court, the undersigned finds that Walsh has failed to meet his burden of

establishing each element necessary for issuance of the requested preliminary injunction.

Initially, the court finds that it is undisputed that, in accordance with the Guidelines issued

by the CDC, the ADOC has undertaken numerous measures to prevent and mitigate the spread of

COVID-19. Even if inmates confined at Ventress, such as Walsh, eventually test positive for the

virus, the Eleventh Circuit has found that it is improper for a court to equate an increased rate of

infection with deliberate indifference.  *Swain*, 961 F.3d at 1287.

> On this point, the Supreme Court's decision in *Farmer* couldn't be any clearer: "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*." *Id.* at 844, 114 S.Ct. 1970 (emphasis added). A resulting harm thus cannot alone establish a culpable state of mind. *Cf. Wilson v. Seiter*, 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (stating that "the 'wantonness' of conduct" doesn't "depend[ ] upon its effect upon the prisoner"); *Wilson v. Williams*, No. 20-3447, 961 F.3d 829, 842–43 (6th Cir. June 9, 2020) (rejecting the contention that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19").

*Swain*, 961 F.3d at 1287.

In this case, the defendants' conduct regarding the transfer of inmates to Ventress who

tested positive for COVID-19 does not appear to show deliberate indifference.  Specifically, there

is nothing before the court which establishes "that [in transferring these inmates] the defendants

acted with a deliberately indifferent mental state, equivalent to 'subjective recklessness as used in

the criminal law.' *Farmer*, 511 U.S. at 839–40, 114 S.Ct. 1970." *Swain*, 961 F.3d at 1289.

Furthermore, "[b]ecause the defendants 'act[ed] reasonably,' they 'cannot be found liable' under

the Eighth Amendment. *See* [*Farmer*, 511 U.S.] at 845, 114 S.Ct. 1970; *see also Williams*, 961

F.3d at 839–40." *Swain*, 961 F.3d at 1289.  Consequently, under the present circumstances, the

court cannot conclude that Walsh has shown a substantial likelihood of success on the merits and

his motion for preliminary injunction is therefore due to be denied for this reason alone.  The court

will, however, briefly address the remaining elements necessary for issuance of a preliminary

injunction—irreparable harm, balancing of the harms, and the public interest.

Regarding the second element for issuance of a preliminary injunction, Walsh has not

demonstrated he will suffer irreparable injury absent the injunctive relief sought in this case.

"[T]he inquiry isn't [simply] whether the plaintiff[] ha[s] shown that the virus poses a danger to

[him] in the abstract—it undoubtedly does—but rather whether [he] ha[s] shown that [he] will suffer irreparable injury 'unless the injunction issues.' *Jones v. Governor of Fla.*, 950 F.3d [795,] 806 [(11th Cir. 2020)]." *Swain*, 961 F.3d at 1292. "'As [the Eleventh Circuit] ha[s] emphasized on many occasions, the asserted irreparable injury must be neither remote nor speculative, but actual and imminent.' *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quotation omitted)." *Swain*, 961 F.3d at 1292. To obtain preliminary injunctive relief, Walsh must therefore identify an injury that is actual and imminent, not remote or speculative. *See Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Merely showing the "possibility" of irreparable harm is insufficient. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." ).

It is undisputed that incarceration "comes with its flaws. Even without a highly contagious pandemic, there is always an unfortunate risk that detainees will be exposed to certain communicable diseases, such as the common cold or tuberculosis." *Matos v. Lopez Vega*, __ F.Supp.3d __, __, 2020 WL 2298775, at *10 (S.D. Fla. May 6, 2020). Correctional officials "have made conscious efforts to create a safe environment for the [prisoners at Ventress] and [its] staff, despite inherent obstacles and the novel COVID-19 virus." *Id.* Thus, Walsh has not shown anything more than his fear of possibly suffering an injury which is remote and speculative.

Finally, "[t]he third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, each of these factors weighs in favor of the defendants.

The public interest and that of the State in managing the housing of inmates is clearly significant. Additionally, "[n]othing in the record indicates that the defendants will abandon the current safety measures absent a preliminary injunction, especially since the defendants implemented many of those measures before the plaintiff[] even filed the complaint. . . . For that reason, the balance of harms weighs in the defendants' favor." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020), subsequent determination, *Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020); *see also Woodford v. Ngo*, 548 U.S. 81, 94 (2006) ("[I]t is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'"). Moreover, the court finds that allowing inmates to determine where other inmates are housed, as requested by Walsh, would be adverse to both of these interests.

### III. CONCLUSION

Walsh's stated concerns regarding COVID-19 are understandable; however, he has not shown the he is entitled to the injunctive relief that he seeks. An injunction is "not to be granted unless the movant clearly establish[es] the burden of persuasion as to all four elements." *CBS Broadcasting v. Echostar Communications Corp*., 265 F.3d 1193, 1200 (11th Cir. 2001) (internal quotations omitted). Because Walsh has failed to meet this burden, the court concludes that Walsh's request for a preliminary injunction is due to be denied.

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. Plaintiff's motion for preliminary injunction (Doc. 5) be DENIED.

2. This case be referred back to the undersigned for additional proceedings.

**On or before March 18, 2021**, the parties may file an objection to the Recommendation. The parties must specifically identify the factual findings and legal conclusions contained in the Recommendation to which objection is made. Frivolous, conclusive, or general objections will

not be considered by the court.  This Recommendation is not a final order and, therefore, it is not appealable.

Failure to file written objections to the proposed factual findings and legal conclusions set forth in the Recommendations of the Magistrate Judge shall bar a party from a *de novo* determination by the District Court of these factual findings and legal conclusions and shall "waive the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice.  11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993) ("When the magistrate provides such notice and a party still fails to object to the findings of fact [and law] and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE, on this the 3rd day of March, 2021.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge