**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **JOHN O. WALSH, JR., AIS 311111,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )        **Case No. 2:20-cv-653-RAH-CWB** |
| | ) |
| **WARDEN BUTLER, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I.    Introduction

Plaintiff John O. Walsh, Jr., a *pro se* inmate, filed this action pursuant to 42 U.S.C. § 1983. (*See* Docs. 1, 2).  The operative pleading is now the Amended Complaint (Doc. 5), which names the following as defendants: Ventress Correctional Facility Warden Reosha Butler, Easterling Correctional Facility Warden John Crow, former Alabama Department of Corrections ("ADOC") Commissioner Jefferson Dunn,[1] Assistant ADOC Commissioner Cheryl Price,[2] and Wexford Health Administrator Celeste Hunter.  (*Id.* at pp. 1-2).

According to Walsh, ADOC inmates who tested positive for COVID-19 in June 2020 were transferred to Ventress Correctional Facility, which is where he was being incarcerated.  (*Id.* at pp. 2, 4).  Although Walsh had not contracted COVID-19 at the time this action was filed, he

---

[1] John Hamm has replaced Jefferson Dunn as Commissioner for the Alabama Department of Corrections.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Hamm thus is automatically substituted as a defendant in his official capacity.  Former Commissioner Dunn remains a defendant in his individual capacity.  The Clerk of Court is DIRECTED to update the docket sheet and caption accordingly.

[2] Cheryl Price was incorrectly identified in the Amended Complaint and on the docket as "Sherry Price."

claims "the transfer of the deadly disease to [his] camp was unreasonable[] and made Ventress a very unsafe place." (*Id*. at p. 8). Based upon those allegations, Walsh purports to bring an Eighth Amendment deliberate indifference claim and a Fourteenth Amendment equal protection claim.[3] For relief, Walsh seeks monetary damages, for the court to "tell Warden Butler to be more careful next time, and call the C.D.C. if anyone tries to put a virus in her camp," and for the court to tell Warden Crow "not to release anyone for transfer that has a serious disease or virus that can cause death in another camp."[4] (*Id*. at p. 6).

On October 14, 2020, the court issued an Order directing the defendants to file a Special Report addressing Walsh's claims (Doc. 8), which the defendants did by submissions on December 1, 2020 (Doc. 27) and January 5, 2021 (Doc. 29). In their Special Reports, which were accompanied by various evidentiary materials, the defendants moved for summary judgment or dismissal. (*See* Doc. 27 at p. 16; Doc. 29). After reviewing the Special Reports, the court directed Walsh to respond with affidavits or statements made under penalty of perjury and other evidentiary materials. (Doc. 30). Walsh subsequently filed a response. (Doc. 31).

In the court's February 9, 2021 Order, the parties were notified that the "court may at any time [after expiration of the time for Walsh to file a response] and without further notice to the parties (1) treat the [special] reports, … and all supporting evidentiary materials as motions for summary judgment, and (2) after considering any response …, rule on the dispositive motions in

---

[3] Throughout the Amended Complaint, Walsh maintains that his Eighth and Fourteenth Amendment rights have been violated by the defendants' conduct. (*See generally* Doc. 5). The court will treat Plaintiff's *pro se* pleading liberally and, in an abundance of caution, construe it as attempting to state a Fourteenth Amendment equal protection claim in addition to an Eighth Amendment deliberate indifference claim.

[4] Walsh also sought a preliminary injunction "for the state to send all the COVID-19 patients back to the camp they came from, and not to send more [to Ventress]." (Doc. 5 at p. 5). However, Walsh's motion for a preliminary injunction was denied. (*See* Docs. 32, 33).

accordance with the law." (Doc. 30 at p. 3). Pursuant to that disclosure, the undersigned Magistrate Judge will now construe the defendants' Special Reports as presenting arguments for summary judgment and will recommend that summary judgment be granted in the defendants' favor on all claims.

## II.    Summary Judgment Standard

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party … . [A fact] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has satisfied that burden, the nonmovant is required to cite portions of the record showing a genuine dispute of material fact. *Id.* at 324. The nonmovant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish a genuine dispute of material fact, the nonmovant must produce evidence such that a reasonable trier of fact could return a verdict in its favor. *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Summary judgment also should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In determining whether a genuine dispute of material fact exists, the court must view all of the evidence in a light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmovant's favor. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see also* Fed. R. Civ. P. 56(a). Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.  Relevant Facts[5]

The following facts are derived from the verified Amended Complaint (Doc. 5) and the sworn or verified evidentiary materials presented by the defendants (Docs. 26-1 through 26-5; Docs 27-1 through 27-5; Docs. 28-1 through 28-5). Although Walsh filed a response (Doc. 31), it was neither sworn nor verified in accordance with 28 U.S.C. § 1746—precluding its consideration for purposes of summary judgment.[6]

---

[5] The "facts" set forth herein are merely for purposes of resolving summary judgment and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) ("[W]hat we state as 'facts' … for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.").

[6] *See, e.g., Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) (*citing Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003), *as amended*, (Sept. 29, 2003) (noting that "[u]nsworn statements may not be considered by a district court in evaluating a motion for summary judgment."); *McCaskill v. Ray*, 279 F.App'x 913, 915 (11th Cir. 2008) (holding that district court should not have considered unsworn and unverified allegation in deciding summary judgment); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) (noting that omission of the phrase "under penalty of perjury" would "allow[] the affiant to circumvent the penalties for perjury in signing onto intentional falsehoods"); *Grupo Rayco C.A. v. Delta Air Lines, Inc.*, No. 1:20-CV-1952, 2021 WL 1351859, at *9 n.3 (N.D. Ga. Mar. 16, 2021) ("By omitting the requisite language stating that the certification was made 'under penalty of perjury,' counsel has failed to substantially comply with [§ 1746].").

As to Warden Butler, Walsh alleges:

Warden Butler has, ever since she came here to Ventress, done all she could to make this a safe prison. She has got the inmate on inmate violence way down, she has also done everything in her power to treat everyone equal, no matter who you are. With this said, I have doubts about her OKing the COVID-19 patients in her camp. But for some reason [she] did, with an indifference to an unreasonable risk of a serious harm[] or death to me ... .

Warden Butler should have called the Center for Disease Control and Prevention, and they would have made them take them back[] to their camp, and this is where she showed her negligence in her duty to keep me safe[] and protect me from an unreasonable risk of serious harm or death from COVID-19 due to the exposure of this disease ... .

(Doc. 5 at p. 7).

As to Warden John Crow, Walsh alleges:

The Warden at Easterling Corr. Facility knew she/he was transferring positive COVID 19 patients to Ventress Corr. Facility, which was COVID 19 free[.] This transfer violated my Constitutional Amendment 8, for it has and did put me in an unreasonable risk of serious harm, or death. Thus, she/he was very negligent for the human life by this exposure of the deadly disease to my camp.

(*Id*. at p. 4).

As to former Commissioner Dunn, Walsh alleges:

[Commissioner] Dunn has knowingly and willfully violated my constitutional rights under the 8th and 14th Amendments ... through his willful negligence of the transfer of the positive tested COVID 19 patients from Easterling, to a COVID 19 free camp, Ventress. ... But did not take any reasonable care in which is a part of his duty to protect and keep me safe at the best of his ability, not to deliberately spread a deadly disease to Ventress Corr. Facility, where I am at. Thus, he has not taken any reasonable care in his duty ... for he should have detained the deadly disease where it was, not spread it across the state prisons[.] Thus[,] he has shown no concern for human life.

(*Id*. at p. 8).

As to Assistant Commissioner Cheryl Price, Walsh alleges:

Assistant Prison Commissioner [] Price did violate my 8th Amendment right ... for she knew that the coronavirus is a serious disease that has caused a great harm, and death, throughout the world, and is a serious disease that has caused a massacre

> throughout the United States. ... [She] is the one that signs for any and all inmate transfers in the Alabama D.O.C.  She is over the transfer section, and if the transfer papers were signed it was done under the color of law, and this shows a deliberate indifference to my life, and safety, from an unreasonable risk of COVID 19 that should have been under quarantine at Easterling, where they were tested positive at.

(*Id*. at p. 10).

> Finally, as to Celeste Hunter, Walsh alleges:

> Celeste Hunter ...  has violated my 8th Amendment under a deliberate indifference of my health, for they have denied me access to mental health, for mental stress, and temperature checks. …

> [] I am in H-Dorm and we have had inmates that tested positive for COVID-19. The first day we were put on lockdown we could not get medical to come to the dorm and check our temperature.  This act added to my mental and psychological stress I was having.

(*Id*.  at p. 4).

> Walsh additionally alleges more generally as follows:

> Ventress ... is so overcrowded that [inmates] sleep less than four feet apart, and the temperature in the day gets from 98° to 102° in the dorm, and when I go to eat I have to sit shoulder to shoulder with other inmates in the dining hall, and this alone makes Ventress ... an incubator for growing bacteria and diseases. ... [] Because his camp was not set up to keep the COVID 19 patients that were sent here, they were put wherever they could put them. And now it is in my Dorm an I have been under a lot of stress[.]

(*Id*. at p. 9).  Walsh had not contracted COVID-19 at the time he filed this action, but he claims

his dorm was "under lock-down quarantine," which put him "under a lot of stress mentally and

psychologically," and that his fear of getting sick "caused [him] not to be able to eat and keep

[his food] down."  (*Id*.).

In response, the defendants concede that six inmates who tested positive for COVID-19

were transferred from Easterling to Ventress during or around July 2020.  (Doc. 27-1 at p. 4;

Doc. 28-3 at pp. 2-3).  However, the defendants aver that those inmates were housed under

medical quarantine in a specific, designated location that facilitated medical isolation, that their movements were restricted to prevent them from coming into contact with other inmates, and that prison officials have taken, and continue to take, extensive actions to protect inmates and staff from the spread of COVID-19  throughout all ADOC facilities.  (Doc. 27-1; Doc. 28-3).

To address the COVID-19 pandemic, the United States Centers for Disease Control and Prevention ("CDC") issued an "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities."  (Docs.  27-4 at p. 2; Doc. 28-2 at p. 2). In an effort to prevent or mitigate the introduction and spread of COVID-19 in these facilities, the CDC recommends that a number of steps be taken, including but not limited to:

> (1) restricting or suspending the transfers of detained persons and to subject any transfers to medical isolation to evaluate if COVID-19 testing is appropriate; (2) quarantining all new inmates for 14 days before they enter into the general population; (3) cleaning and disinfecting surfaces that are frequently touched multiple times per day, including the use of disinfectants effective against the virus; (4) providing detainees, at no cost, with soap, running water, and hand drying machines or paper towels; (5) implementing social distancing strategies to increase the physical space between each detained person; and (6) medically isolating confirmed or suspected COVID-19 cases.

*Archilla v. Witte*, No. 4:20-CV-596, 2020 WL 2513648, at *3 (N.D. Ala. May 15, 2020).  The CDC's guidance is subject to adaptation for specific institutional settings "based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." (Docs. 27-4 at p. 2; Doc. 28-2 at p. 3).

The defendants aver that they follow the CDC's guidelines, from both a medical and security perspective, and that they have taverken numerous steps to combat the spread of COVID-19 throughout ADOC facilities:

> From the outset of the pandemic in March 2020, ADOC worked to create and implement a plan to respond to the COVID-19 pandemic, both system wide and at Ventress. [Doc. 28-1 at ¶ 7; Doc. 28-3 at ¶ 6]. ADOC focused its efforts on operational preparedness, education, increased cleaning and disinfection of

facilities, screening, restriction of movement into facilities, and securing and distributing hygiene, cleaning, and medical supplies. [*Id*.]. Additionally, ADOC created specific local teams identified as Pandemic Planning Teams at a facility level to implement protective measures to mitigate inmate and staff exposure to the virus. [Doc. 28-1 at ¶ 7].

[] Beginning in early March 2020, recognizing the threat of COVID-19, ADOC developed a plan of action to combat the spread of COVID-19 and to protect the inmates and staff. As part of ADOC's efforts to reduce the spread of COVID-19, it initiated an education and communication strategy directed to both staff and inmates. [Doc. 28-1 at ¶ 8; Doc. 28-3 at ¶ 6]. These communications consisted of documents and information developed by ADOC's Office of Health Services ("OHS") and the CDC. (*Id*.). The materials provide basic information on COVID-19, such as what it is, how it spreads, and the common symptoms. (*Id*.). Additionally, the documents describe the best methods for protecting oneself and how to help prevent the spread of the virus. (*Id*.). These measures include proper hygiene practices, identifying the signs and symptoms of COVID-19, social distancing, and identifying methods for addressing stress associated with the virus. (*Id*.).

[] In addition to educating staff and inmates, ADOC has taken a number of proactive steps to curb the spread of COVID-19. ADOC, consistent with CDC Guidance, temporarily suspended new intakes[7] and modified the intake process. [Doc. 28-1 at ¶ 9; Doc. 28-3 at ¶ 6]. Additionally, ADOC suspended all outside visitors from entering any facility, and implemented a screening procedure prior [to] transferring inmates between ADOC facilities. [Doc. 28-1 at ¶ 9; Doc. 28-3 at ¶ 6].

For staff, ADOC implemented a pre-work screening procedure and a process for employees who call-in sick. [Doc. 28-1 at ¶ 9; Doc. 28-3 at ¶ 6]. Prior to entering the facility, officers must answer a series of questions and have their temperature checked. (*Id*.). If an officer calls in with an illness, the officer must respond to specific screening questions, and each facility must maintain a log to track all illness related absences. [Doc. 28-1 at ¶ 10].

To provide for a clean environment, ADOC resourced and provided to all facilities, including Ventress, cleaning supplies with instructions for cleaning the facilities and a specific checklist for cleaning kitchens. [Doc. 28-1 at ¶ 11; Doc. 28-3 at ¶ 6]. ADOC acquired and distributed facemasks for officers and inmates. [Doc. 28-1 at ¶ 12; Doc. 28-3 at ¶ 8]. The facemasks provided to inmates include instructions for care and cleaning of the masks, and a written acknowledgment form signed

---

[7] ADOC temporarily halted new intakes on March 20, 2020 for a minimum of 30 days to allow it to create an intake procedure that will allow for a 14 day quarantine to help prevent infected inmates from being introduced into the population. [Doc. 28-1 at ¶¶ 9, 14, 15, 18.]

by the inmate acknowledging receipt or refusal of the masks. [Doc. 28-1 at ¶ 12; Doc. 28-3 at ¶ 6].

[] In addition to specific movement restrictions, education, and staffing restrictions, ADOC created and implemented protocols for testing inmates suspected of being COVID-19 positive, and quarantining and medically isolating inmates directly exposed to or testing positive for COVID-19. Decisions on whether to test an inmate rests with medical personnel based upon criteria developed by ADOC from CDC Guidance, and in coordination with the three (3) level quarantine protocol.

Quarantine and testing occurs based on a three (3) tiered system. [Doc. 28-1 at ¶ 18]. Level one, also known as "watchful wait," requires inmates suspected of exposure to a COVID-19 positive person to be isolated from the general population and monitored for fever and other symptoms of COVID-19. Level one does not require testing. (*Id*.). Level two requires an inmate who exhibits signs or symptoms of COVID-19 or has confirmed prolonged direct exposure to a person who has tested positive to be isolated and tested for COVID-19. (*Id*.). Level three requires medical quarantine for any inmate who tests positive for COVID-19. (*Id*.).

In an effort to provide medical care and operate in a reasonable and efficient manner, ADOC established a medical quarantine area at Ventress to accommodate several facilities. [Doc. 28-3 at ¶ 5]. Inmates, including [those] from Easterling [], have been and will be transferred to Ventress for medical quarantine. [Doc. 28-3 at ¶ 5; Doc. 28-4 at p. 3]. The location within the Ventress grounds allowed ADOC to maintain separation of the COVID-19 positive inmates from the general population, and provide necessary medical care for infected inmates. [*Id*.]. Inmates in the medical quarantine area must remain in the specific location. [Doc. 28-3 at ¶ 5]. ADOC provides all necessary services, including meals and medical care, to the inmates within the medical quarantine area. [*Id*.]. No other inmates, including Plaintiff, have or ever had access to medical quarantine area or inmates within the quarantine area. (*Id*.).

[] While ADOC's administration and OHS have worked tirelessly to curb the spread of COVID-19 system-wide, Warden Butler and Ventress staff engaged in the fight on the frontlines. [Doc. 28-3 at ¶ 6]. Warden Butler, supported by [ADOC Associate Commissioner for Health Services Ruth] Naglich, stated that she and her staff have conducted or overseen the following preventative actions and measures at Ventress:

a.  educating inmates and staff through oral and written communications, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;

b.  encouraging inmates and staff to engage in proper hygiene practices and social distancing;

c. providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing;[]

d. continuing medical appointments such as chronic care clinics and sick-call appointments;

e. suspending copays for inmates seeking medical services;

f. implementing intensified cleaning and disinfecting procedures;

g. suspending the intake of new inmates and, when restarted, ensuring an appropriate quarantine and screening before transferring the new intakes from a temporary intake facility to a permanent intake facility;

h. performing verbal screening and temperature checks for all persons entering the facility and, if a person has a temperature over 100.4 degrees Fahrenheit or other symptoms of COVID-19, denying the person entry into the facility;

i. implementing social distancing strategies;

j. providing masks to each inmate (and a replacement if these initial masks are misplaced or destroyed), along with instructions on wearing, cleaning, and caring for the masks;

k. providing masks and gloves to administrative and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;

l. implementing a quarantine or medical isolation plan for any inmate or staff who tests positive for COVID-19 or is suspected of having or being exposed to COVID-19;

m. monitoring inmates for symptoms of COVID-19 such as cough and shortness of breath or at least two (2) of fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell; and

n. testing inmates for COVID-19 with symptoms of COVID-19 or contact with a person testing positive for or suspected of having COVID-19.

[] To provide a clean environment, Warden Butler established a cleaning schedule that requires all surfaces, including bathrooms and living areas, to be cleaned and sanitized at least two (2) times per shift, for a total of six (6) cleanings per day. [Doc. 28-3 at ¶ 7]. In addition, Warden Butler implemented social distancing measures at Ventress, suspending congregational services, prohibiting religious and educational personnel from entering the facility, and requiring inmates to maintain at least six (6) feet distance while standing in line for meals, phones, or any other

matter. (*Id*. at ¶ 8). These efforts are on top of the system-wide restrictions that began in March 2020, suspending all outside work in the community, and all visitation. [*Id*. at ¶ 6].

ADOC Official[s'] tireless efforts continue to keep the spread of COVID-19 contained at Ventress. As of December 1, 2020, only seventeen inmates have tested positive for COVID-19 since March 2020, and no COVID-19 positive inmate cases remain. [Doc. 28-4 at p. 3]. Additionally, twenty-four officers have tested positive since the beginning of the pandemic and only one staff member remained under self-quarantine as of December 4, 2020. [Doc. 28-3 at ¶ 9].

(Doc. 28 at pp. 6-12).

Defendant Hunter has specifically testified that "Inmates are tested for COVID-19 for three separate reasons:"

a. Symptoms such as fever, headache, congestion, shortness of breath, cough, loss of taste or smell, or GI symptoms.  The medical provider makes the decision to test these patients.

b. Patients who are scheduled to go for an off-site appointment or procedure are tested at the request of the off-site provider.

c. Patients are tested when the decision is made from the OHS to conduct mass testing.

Patients who test positive for COVID-19 are placed in medical isolation.  The area of medical isolation is determined by ADOC.  Single cells are used until they are filled to capacity.  Once that happens arrangements are made for the positive patients to be held in an area separate from other inmates.  Again, this area is determined by the ADOC.

Patients who test positive for COVID-19 are screened daily for worsening of symptoms and treated accordingly.  This is accomplished by nursing and medical provider assessment.  Treatment is based on symptoms and can include medications such as OTC medications (Tylenol, Guiafenesin), or antibiotics, inhalers, as indicated.

If the patient's symptoms cannot be managed on-site, they are sent to the free world ER for evaluation and treatment.

(Doc. 27-1 at pp. 5-6).  At the time this action was filed, however, Walsh had not received a COVID-19 test because he never exhibited any signs or symptoms of COVID-19.  (*Id*. at p. 5).

Moreover, as to Walsh's allegation that he was denied "access to mental health for mental stress" (Doc. 5 at p. 4), Defendant Butler avers that mental health services were not suspended at Ventress. (Doc. 28-3 at p. 5).  Inmates who completed a written request for mental health counseling or treatment, or who were referred for those services, were seen by mental health professionals.  (*Id.*)

## IV.   Discussion

### A.   Sovereign Immunity

Defendants Dunn, Price, Crow, and Butler assert that Walsh's suit is barred by Eleventh Amendment immunity to the extent it seeks to recover monetary damages against them in their official capacities.[8]  (Doc. 29 at p. 14).

Official capacity suits are "in all respects other than name, ... treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  As such, a state employee may not be sued in his or her official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).  With specific respect to the types of claims now being asserted by Walsh, it has been recognized that "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it."

---

[8] Defendant Hunter also asserts that she is entitled to sovereign and qualified immunity.  (Doc. 17 at p. 3). The briefing indicates that Defendant Hunter works for Wexford Health Sources, Inc., the prison healthcare contractor.  (Doc. 27-1 at p. 2).  As an employee of the contract healthcare provider, Defendant Hunter's qualified immunity argument is foreclosed by *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir.1999), *amended*, 205 F.3d 1264 (11th Cir. 2000).  In *Hinson*, the Eleventh Circuit relied upon the reasoning expressed in *Richardson v. McKnight*, 521 U.S. 399 (1997), where the Supreme Court declined to extend qualified immunity to privately employed prison guards, to hold that qualified immunity may not be extended to privately employed prison physicians. Based upon *Hinson*, Defendant Hunter thus cannot claim the protection of qualified immunity.  In addition, for similar reasons that the *Hinson* and *Richardson* courts declined to extend the doctrine of qualified immunity, Defendant Hunter is not entitled to sovereign immunity as available to the State and its employees.

*Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990)).   Accordingly, Defendants Dunn, Price, Crow, and Butler are entitled to sovereign immunity as to all claims seeking monetary damages against them in their official capacities.   *See, e.g., Selensky v. Alabama*, 619 F. App'x 846, 849 (11th Cir. 2015) ("[T]he Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees].");  *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials in their official capacities are protected under the Eleventh Amendment from suits for damages);  *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).

### B.    Qualified Immunity

As to Walsh's claims against Defendants Dunn, Price, Crow, and Butler in their individual capacities, qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if the underlying conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is not merely a defense against liability but immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (quotation marks and citation omitted).

To receive qualified immunity, a defendant first must prove that he or she was acting within the scope of discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  The record here establishes that the defendants indeed were

acting within the course and scope of their discretionary authority.  The burden therefore shifts to Walsh to present evidence that the defendants are not entitled to qualified immunity. *See, e.g., Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To meet that burden, Walsh must show two things: (1) that the defendants committed a constitutional violation and (2) that the constitutional right the defendants violated was "clearly established." *Id.*; *see also Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. ...  In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations and quotation marks omitted) (alteration in original).  The court may analyze the elements "in whatever order is deemed most appropriate for the case," and a finding of qualified immunity is appropriate if sufficient evidence has not been presented as to any one of the elements.  *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241-42).

### i.    Deliberate Indifference

Prison officials have a duty under the Eighth Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  A prison official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it.  *Farmer*, 511 U.S. at 828.

14

To survive summary judgment on a conditions of confinement claim, a plaintiff must satisfy both an objective and subjective inquiry. *Id*. at 834; *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (holding that the law requires establishment of both objective and subjective elements to demonstrate an Eighth Amendment violation). Under the objective component, the plaintiff must demonstrate "a substantial risk of serious harm." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015) (citation omitted).  In *Swain v. Junior*, the Eleventh Circuit acknowledged "that the risk of COVID-19 satisfies this requirement." 961 F.3d 1276, 1285 (11th Cir. 2020). Under the subjective component, the plaintiff must prove a "deliberate indifference" to that risk by making three sub-showings: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Id*. (citation omitted).

The defendants appear to concede subjective knowledge of the risk posed by COVID-19. (*See, e.g.,* Doc. 29 at p. 5: "ADOC Officials recognized the danger created by COVID-19."). Therefore, Walsh's claim hinges on whether the defendants disregarded that risk through conduct that was more than mere negligence. *See Swain*, 961 F.3d at 1285; *Helling v. McKinney*, 509 U.S. 25, 35-36 (1993) (holding that a plaintiff may state an Eighth Amendment claim against prison officials based upon conditions that "pose an unreasonable risk of serious damage to his future health" if he shows that "he himself is being exposed" to the potential health risk and that "prison authorities are ignoring the possible dangers posed by exposure"). The conduct at issue, however, "must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id*.

In *Swain*, the Eleventh Circuit addressed the deliberate indifference standard as it applies

to the management of COVID-19 in a prison setting:

> [E]ven while the district court seemed to assume a state of affairs in which the
> defendants had taken numerous measures to combat the virus, it held that the
> defendants were nonetheless deliberately indifferent based on two considerations:
> (1) the increase in the rate of infections ... and (2) the lack—and seeming
> impossibility—of meaningful social distancing at the facility.  In so concluding, the
> district court erred.  Neither the resultant harm of increasing infections nor the
> impossibility of achieving six-foot social distancing in a jail environment
> establishes that the defendants acted with "subjective recklessness as used in the
> criminal law." *Farmer*, 511 U.S. at 839-40 ...  (quotation omitted).
>
> First, and most obviously, the district court erred in relying on the increased rate of
> infection.  On this point, the Supreme Court's decision in *Farmer* couldn't be any
> clearer: "[P]rison officials who actually knew of a substantial risk to inmate health
> or safety may be found free from liability if they responded reasonably to the risk,
> *even if the harm ultimately was not averted*." *Id*. at 844 ...  (emphasis added).  A
> resulting harm thus cannot alone establish a culpable state of mind.  *Cf. Wilson v.
> Seiter*, 501 U.S. 294, 303 ...  (1991) (stating that "the 'wantonness' of conduct"
> doesn't "depend[] upon its effect upon the prisoner"); *Wilson v. Williams*, [961 F.3d
> 829, 842–43 (6th Cir. 2020)] (rejecting the contention that "the [Bureau of Prisons]
> was deliberately indifferent to petitioners' health and safety because [its] actions
> have been ineffective at preventing the spread of COVID-19").
>
> Second, and separately, the district court erred in concluding that the defendants'
> inability to ensure adequate social distancing constituted deliberate indifference.
> The court stated no less than eight times in its order that adequate social distancing
> was "not possible" or "impossible." [] [However,] [f]ailing to do the "impossible"
> doesn't evince indifference, let alone deliberate indifference.

*Id*. at 1287.  Upon finding that failure to stop the spread of COVID-19 and failure to adequately

social distance does not amount to deliberate indifference, the court then turned to the measures

taken by the defendants to mitigate the spread of the virus:

> [T]he [court-commissioned expert] report observed that the defendants put "tape
> on the floor to encourage social distancing in lines," that "bunks are staggered with
> head to foot configuration" in order to maximize the distance between faces during
> sleep, and that "[p]atients are staggered and appropriately distanced when going to
> medical."  Importantly, we think, while the report noted some social-distancing
> violations, it concluded that [the facility's] administrators and employees were
> "doing their best balancing social distancing and regulation applicable to the
> facility," and that they "should be commended for their commitment to protect the

staff and the inmates." It's worth noting, though not determinative, that the CDC's guidance—on which the district court relied heavily—presupposes that some modification of its social-distancing recommendations will be necessary in institutional settings. The guidance states in bold-face type, on the very first page, that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Regarding social distancing specifically, it says that while there should "ideally" be six feet between inmates, "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff," and that "[n]ot all strategies will be feasible in all facilities." It therefore offers "strategies with varying levels of intensity," such as—importantly here, because the defendants claimed to have done so—"[a]rrang[ing] bunks so that individuals sleep head to foot to increase the distance between them."

Moreover, the defendants have represented that they took numerous *other* measures—besides social distancing—to mitigate the spread of the virus. The district court summarized a few of them:

- "requiring staff and inmates to wear face masks at all times (other than when sleeping)";
- "conducting screening for all staff entering the facility";
- "conducting daily temperature screenings for all inmates";
- "suspending all outside visitation"; and
- "providing disinfecting and hygiene supplies to all inmates."

[] The court assumed, for the sake of its deliberate-indifference analysis, at least, that the defendants had implemented these measures, but nonetheless concluded, as a matter of law, that they must have been inadequate because (1) the rate of infections rose and (2) social distancing—which it took to be the most critical measure—wasn't possible.[]

*Id*. at 1288-89 (citations to the record omitted). Finally, the court held as follows:

Whatever deliberate indifference is, the defendants' conduct here doesn't show it. The district court erred in holding that the defendants acted with a deliberately indifferent mental state, equivalent to "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839-40 ... . We simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by "doing their best." Because the defendants "act[ed] reasonably," they "cannot be found liable" under the Eighth Amendment. *See id.* at 845[.]

*Id*. at 1289.

Consistent with *Swain*, the undersigned finds that the defendants' conduct in this case does not rise to the level of deliberate indifference.  The defendants have provided substantial evidence detailing the numerous steps prison authorities have taken to mitigate the spread of COVID-19 throughout the prison system and, specifically, at Ventress.  Without the need to repeat each of those steps, which are provided in detail above, suffice it to say that the defendants have taken significant measures to implement precautions to protect Walsh and other inmates as recommended by the CDC, including—but certainly not limited to—restricting the six inmates transferred from Easterling to medical quarantine in a designated area isolated from other inmates. (Doc. 27-1; Doc. 28-1; Doc. 28-3 at pp. 2-3).  Walsh has failed to refute the defendants' evidence with anything more than broad, conclusory assertions that the defendants acted unreasonably by the mere act of transferring COVID-positive inmates to Ventress.  (*See generally* Doc. 5).  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (holding that "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

The court is acutely cognizant of the serious nature of COVID-19, particularly at the time this action was filed, when the virus was still novel and rampant throughout the United States. The court further empathizes with Walsh's desire for conditions, such as social distancing, more conducive to mitigating the spread of the virus throughout the prison system.  However, there is nothing in the record to suggest that the defendants acted less than reasonably under the circumstances with which they were presented.  Like the Eleventh Circuit in *Swain*, this court "simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their best.'"  *Swain*, 961 F.3d at 1289.

Moreover, Walsh has failed to establish a genuine dispute of material fact as to his claim that Defendant Hunter denied him medical care.  Walsh vaguely alleges that Defendant Hunter denied him "access to mental health for mental stress" and that on one particular occasion he "could not get medical to come to the dorm and check [his] temperature." (Doc. 5 at p. 4).  Walsh fails to provide any further detail regarding his first allegation, such as when he may have sought treatment, from whom, or how or why treatment was denied.  Additionally, the undisputed evidence demonstrates that mental health services remained available to inmates at Ventress during the pandemic. (Doc. 28-3 at p. 5).  Accordingly, Walsh's bare allegation that he was denied "access to mental health," without more, is insufficient to overcome summary judgment. *See Ellis*, 432 F.3d at 1326.

As to Walsh's second allegation, that "medical" would not come to the dorm to check his temperature on one occasion, he fails to identify any specific individual from whom he sought medical care—much less that he sought care from Defendant Hunter—or provide any allegations or evidence that he required medical care at that time.  Indeed, the undisputed evidence demonstrates that an inmate's temperature will be checked in one of three circumstances—if the inmate develops symptoms of COVID-19, if the inmate goes off-site for an appointment or procedure, or if the decision is made from the OHS to conduct mass testing. (Doc. 27-1 at pp. 4-5).  The evidence further demonstrates that Walsh never exhibited any signs or symptoms of COVID-19 or contracted COVID-19 prior to this action (*Id.* at p. 5), and Walsh does not allege that either of the other two circumstances were applicable.  Thus, Walsh's bare allegations of being denied medical care wholly fail to establish deliberate indifference by Defendant Hunter.

Because Walsh has failed to make a showing of deliberate indifference on the part of Defendants Dunn, Price, Crow, and Butler, his claims against those defendants in their individual

capacities are barred by qualified immunity, and summary judgment on his Eighth Amendment claim is due to be granted in their favor.   Because Walsh also has failed to make a showing of deliberate indifference by Defendant Hunter, summary judgment likewise is due to be entered in her favor on the Eighth Amendment claim.

### D.   Equal Protection

Finally, construing Walsh's *pro se* pleading liberally, it appears that he also purports to bring a Fourteenth Amendment equal protection claim based on the defendants' conduct in transferring COVID-positive inmates to Ventress.   To the extent Walsh intends to establish such a claim, he has wholly failed to do so.   To overcome summary judgment on an equal protection claim, Walsh must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment and (2) his discriminatory treatment was based on race, religion, national origin, or some other constitutionally protected basis.   *See Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001).   Walsh has done neither.   He has not alleged or provided evidence of any similarly situated prisoners who received more favorable treatment; nor has he alleged or provided evidence that he was discriminated against based on a constitutionally protected basis. Accordingly, Defendants Dunn, Price, Crow, and Butler are entitled to qualified immunity, and summary judgment on Walsh's purported Fourteenth Amendment equal protection claim is due to be granted in their favor.   Moreover, summary judgment likewise is due to be granted in favor of Defendant Hunter on Walsh's purported Fourteenth Amendment claim.

### V.   Conclusion

For the reasons stated above, the undersigned Magistrate Judge hereby **RECOMMENDS** as follows:

- that the defendants' Special Reports (Docs. 27 & 29), which are construed as motions for summary judgment, be granted in favor of the defendants on all claims;

- that this action be dismissed with prejudice.

It is **ORDERED** that any objections to this Recommendation must be filed no later than September 1, 2023.  An objecting party must identify the specific portion of the factual findings or legal conclusions to which the objection is made and must describe in detail the basis for the objection. Frivolous, conclusive, or general objections will not be considered.  This Recommendation if not a final order and, therefore, it not appealable.

Failure to file a written objection to this Recommendation shall bar a party from a de novo determination by the District Court of any factual findings or legal conclusions contained herein and shall waive the right of the party to challenge on appeal any subsequent order that is based on factual findings and legal conclusions accepted or adopted by *see Resol. Tr. Corp., v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

**DONE** this the 18th day of August 2023.

_____
**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**